Page number 18 at 6179 at L. National Parks and Conservation Assoc. v. Todd C. Semonite Senate Governor, Senate General at L. Mr. Hugh May for the Todd NCCA Mr. Adams for the Todd National Parks and Historic Preservation at L. Mr. Magnus for the Todd D. Citizenship Chief at L. and Mr. Lynn for L. D. Virginia Electric and Charcoal Mr. Eubanks Good morning, Your Honor. I'm Mr. Adams, actually. Oh, sorry. I apologize. Okay. And I represent the National Trust for Historic Preservation and Preservation Virginia. And you're splitting with Mr. Eubanks? I am, Your Honor. We're splitting ten minutes each, and I'd like to reserve one minute of my time for the follow-up. Okay. And unless the Court has other direction, I'd like to start with our National Historic Preservation Act claim and then move to the National Environmental Policy Act. So this case is about construction of overhead transmission lines up to 295 feet tall through the heart of a historic district near Jamestown, Virginia. It's undisputed that the project will adversely affect eight sites listed in the National Register of Historic Places, including the Jamestown, Hog Island, Captain John Smith Historic District, and Carter's Grove National Historic Landmark. The effect on the landmark implicates Section 110-F, which requires that prior to approving any project that may directly and adversely affect a National Historic Landmark, the lead federal agency, quote, shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark. That's not the statutory language. That's the regulation? No, Your Honor, that's it. 54 U.S.C. 306-107, which is the 110-F statute that was recently recaused. Here, our position is Section 110-F applies because the project will directly affect Carter's Grove. There's no intervening cause, so the resulting impact of the project is a direct one. The Court's position, of course, is that Section 110-F never applied because directly really means physically, and the project won't physically touch the landmark. I think it's fair to say that the parties also differ on the right way to resolve this issue. We say the rules of statutory construction without deference to the Court. The Court is looking for deferential, arbitrary, and capricious review. But as we've explained in our brief, both paths lead to the same place. Section 110-F applies. If it's a question of statutory interpretation, we submit that plain language, ordinary meaning, and congressional intent all point to directly being about causation, not physicality. And if it's a question of arbitrary and capricious review, the Court arbitrarily and capriciously based its interpretation of Section 110-F on a guidance document that was issued by the Advisory Council for Historic Preservation, even though the guidance on its face doesn't apply to this situation. The author of the guidance, the Advisory Council, told the Court on two different occasions that the Court's approach was wrong. And the Park Service, to which Congress gave some responsibility for interpreting Section 110-F, said the same thing. The Court says in its brief that even if you're right about the interpretation that it is causation, that they, in fact, did that. That they looked at the visual impact. Your Honor, the case law on what is required for Section 110-F compliance is not well-developed. Looking at that part of their analysis, what more should they have done? Well, one place that we can look to find what more they should have done is the Presidio case. So there, for example, the Court shows us what that something more that Section 110-F requires might be. And what is that? So we see that that's the Presidio trust case at 811. I know, but what more does it say is required? So there, for example, the project was, quote-unquote, changed dramatically in response to Section 110-F concerns. When Section 110-F was raised, the lead agency developed three preservation alternatives that were given full consideration in an EIS that was circulated to the public. Park Service. I guess I think what Judge Tatel is asking, don't be presumptuous about that. You should be presumptuous. Please, be presumptuous. But what things in this case do you think they should have done that they didn't do if you're right about directly? Well, Your Honor, none of those things that I've mentioned that were present in Presidio. Well, the second one, there are a lot of alternatives analyzed. They considered some alternatives. Not just some. It seems like they considered a lot of alternatives. Most of those alternatives were developed during the State Corporations Commission process, and that was not a process where there was a federal agency applying Section 110-F. Was there an alternative that you think they should have developed that they didn't? We think, Your Honor, that had they applied the alternatives test that's set forth in the 110-F guidelines, and we recognize that those are guidelines, not statute. Those are the ones that are not binding. They are not binding, Your Honor. But we would submit that in this case where they're directly applicable and the agency has reached so far to find guidelines from another agency to avoid the whole thing altogether, and there's no rationale for not applying those. Again, so what alternatives should they have considered if they didn't?  We submit that several of the alternatives would have been deemed feasible or at least would not have been eliminated from full consideration on the basis of an asserted infeasibility. So underwater, the alternatives that were suggested by the Tabor's engineering firm, all of those were eliminated based on NEPA's suggestion that anything that seems infeasible in light of project purposes can be eliminated from full consideration. So now we're getting somewhere. Do you think that something that is infeasible from the point of view of the project still has to be considered? Is that what you're saying? I think what Section 110-F requires is that in determining whether something is infeasible, we don't just consider the purposes of the project, but we also consider the preservation purposes of the statute, and we also weigh the public interest, and we also weigh the amount of harm, and we also weigh the availability of other mitigation measures. That's what's set forth in the guidelines test. And you don't think they did any weighing at all? I don't think they applied that test, Your Honor, and there are two reasons why I say that. One reason is I don't see anything in the record that shows that application. What I see in the record, on the contrary, is an email that says we don't think we need to apply, notwithstanding the direction that was given by the Advisory Council for Historic Preservation. Just to be clear, so under your view is that under the Preservation Act, you have to front load in deciding whether something is feasible or not the impact on the historic landmark, as opposed to just looking at how the project's purposes and some of the feasibility determinations actually change. It's a very different one that includes landmark impact as part of what is feasible or infeasible. That's right, Your Honor. That's it. And I would submit to the Court that this is not a one-of-a-kind situation. I mean, there are environmental laws across the federal code that require alternatives analysis, and they all impose slightly different standards. So the idea that there is a slightly different standard associated with this law. That doesn't sound slightly different. You're saying that even if this project is necessary to prevent blackouts in the other area or to prevent environmental degradation by burning toxic smoke, even if it's necessary for that, it still can't be done, or you have to weigh it against the value of putting the lines across the river, while the other alternatives, the NEPA, does not require that. I think it's the second approach that you suggested. It's that it has to be weighed against the preservation purposes of the statute, the public interest that it attaches to the landmark. It's a weighing exercise. So you're saying something that survives NEPA doesn't survive this. May not survive. What does may mean? I mean, it either does or it doesn't for purposes of the Court. We have to decide. Understood. We don't have to say may. Right. So our position is, in this case, there was no application of the standard, and so that's a violation of the law. Well, there's no application of the guidance. The standard and the guidance, that's exactly right. What part of the standard are we talking about? So the guidance sets forth the three-part balancing test that I mentioned. Yes, I understand. That's why I said that's the guidance. But the guidance, we all agree, isn't the law. So what is the law that we're applying? So our position is, in this factual situation, we have this agency reaching for inapplicable guidance to try and get out of this responsibility, while at the same time there is this clearly applicable guidance that's staring it in the face. There's no reasoned decision-making whatsoever about why this thing is not being implemented. What is the law? Is the law the regulation? Is the law the statute? The law is the statute, Your Honor. And the guidance tells us what the agency should do to comply with the statute. The agency hasn't disputed that these guidelines control if 110 applies. They just said 110 didn't apply. That's right. So in this situation, we have a case where the agency did not apply. It's not a question of whether the alternatives analysis met the guideline standard. There's nothing to look at or for the court to defer to in the record. Your Honor, as I see my time is running a little bit low, I do want to make three quick points on the National Environmental Policy Act, if I might. So first point, and this concerns the finding of no significant impact. A large part of the court's thinking here was that the historic resources would be – the impacts on historic resources would be insignificant because the project will be built at a distance from historic sites. But the technical report that they primarily rely on, this is what's referred to by the parties as the CREA, the cultural resources effects, says the opposite because the project will be built through and within the historic district and, in fact, this will result in some significant impacts. And it uses that term of art, significant. And we submit that this admitted impact of significance requires the preparation of an EIS. Second point concerns the modern intrusions argument. So this comes up in the context of the 40 CFR 1508.27B3, which says that impacts to unique characteristics of an area indicate significance. Here there's no doubt that unique characteristics will be impacted. The court's rationale is that there are other modern intrusions up and down the James River, and so those impacts will be relatively minor. We noted in our briefing that most of these intrusions are elsewhere on the James, they're not right within the viewshed of the project. And, indeed, the project site is part of a 50-mile stretch of river without any overhead crossings. But we would also point the court to JA-2204-05, which represents the court's conclusions on this modern intrusions issue after site visits. The court says, quote, observations made from the river and multiple points on land find many sections of the James River near Jamestown and Hog Island for the project, quote, unquote, quote, to retain significant or sufficient integrity to convey the appearance of the area during the 17th century. So we would submit that having reached that conclusion about what the site conditions are is arbitrary and capricious for them to rest their fancy on this notion of modern intrusions. Let me ask if anybody else on the panel has any further questions. No. All right, thank you. Thank you. Good morning. This case is about the birthplace of our nation and whether placing a project of unprecedented size and unparalleled impact within and across this nationally important historic district warrants an EIS. We think there are many reasons that an EIS is required here, but at bare minimum this project is highly controversial as that term is defined underneath its regulations. As this court stated in Town of Cave Creek, the controversy test is as follows. The term controversial refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action. The decision under review is the paradigmatic example of a substantial dispute under NEPA, and it is not a close call. To begin with, every single entity with subject matter expertise in the affected resources, both inside and outside the federal government, strenuously disputed the Corps of Engineers' conclusions that this project's impact will be, quote, moderate at most. In particular, the National Park Service, which is the federal agency charged by Congress with protecting and safeguarding these affected resources, weighed in in more than 20 detailed, extensive letters vehemently disputing almost every aspect of this decision-making process. Didn't the new Secretary of the Interior say he was satisfied? Your Honor, as we explained in our briefing... That the Corps had satisfied his concerns? So new Secretary Zinke, after the change in administrations, did send a very short cursory letter. A couple of responses to that. So the first is that letter doesn't speak at all to the question before the Court today, which is whether an EIS is required. Secretary Zinke never said an EIS is or is not required. He never said there were or were not significant impacts. So as to that question, there is certainly nothing in the letter that speaks to it. Secondly, that letter never says it's speaking on behalf of the Park Service or its experts that for many years have raised longstanding, detailed technical disputes. Isn't the Secretary that the Park Service is part of the Interior Department? It is part of the Interior Department, yes, Your Honor. At the same time, as we know from State Farm and this Court's many rulings, if an agency, you know, an appointed official wants to override its many experts within the agency, it has to articulate a reasoned explanation and supply a basis for how it reached that outcome if it's reversing course, and we don't think this... But we're not reviewing the decision of the Secretary. We're reviewing the decision of the Corps. We would submit that... That the Corps is satisfied about the Park Service's concerns. And I don't know that that's... I mean, how do we look at that? Right, we're looking at the Corps' decision. The question is whether it's arbitrary and capricious, right? Correct. That is what we're asking. But the question is was the Corps' decision that on this record where we have hundreds of pages of detailed information and recommendations and disputes with the expert agency charged by Congress, the Park Service, was this... Was it arbitrary and capricious for the Corps to rely upon the short cursory letter that did not speak to this issue and determine that that extinguished what is absolutely a palpable controversy that existed with the Park Service? So we can take as given, for purposes of this case at least, that Secretary Zinke's change in position could survive ACA review. But for purposes of determining whether there's something that's highly controversial, doesn't this sort of 180 confirm that there's... There can be good arguments on both sides. Did his letter deny the validity of the arguments of the Corps or just recognize that there can be good arguments on both sides, which sounds like a controversy? It certainly does. We think it supports and underscores that there is a controversy here. And I would also note that... Oh, no, you missed the point of the question. The point of the question is given the Secretary's letter, where is the controversy? Well, the controversy, again, is... With respect to the National Park Service. ...years and years of detailed submissions from the experts within the agency, expertise that certainly Secretary Zinke does not have as an appointed official. I understand all that, but how would you write... What would the sentence in an opinion look like which says the Interior Secretary's judgment about whether the Corps satisfied him about the National Park Service's concerns does not resolve the controversy? How would we explain that? I think there are several ways the Corps could do that. Thank you for the opportunity to weigh in. I think that, most importantly, this letter, once again, doesn't speak to the Park Service and its longstanding concerns. If the Interior Department wanted to articulate why it believed the Park Service's views to be erroneous, it could have done that under basic administrative law principles. That was not explicated in the letter. So there are many ways. We think this letter really is not relevant here, but if anything it underscores the fact that there was a dispute within that department. I would also submit that... Let me push you a little bit. Look, this is... I don't know what the answer is, but it's... This is sort of a question about aesthetics. The Secretary didn't ignore the Park Service's views. He said, I'm now satisfied by the Corps. What more is he supposed to do? Tell me exactly what more he's supposed to do and why. Well, if he wants to actually... I have a different view about this. I'm satisfied about the impact of the power lines on this area. And I'm the head of the Park Service. If he wants to eliminate the controversy that clearly existed up to that date, then he would have to take those issues down on and address them and say, something new that has been produced has changed our view on that and the experts within our agency. And that didn't happen here. The only thing that occurred between the January 2017 letter from NPS... That's not enough of a secretary to say, I've looked at all of this, and I'm now satisfied. I think the Secretary would have to provide a reasoned basis for how to reach that conclusion. And nothing occurred between January 2017 when the Park Service submitted its final letter and March 30, 2017 when the Secretary issued it. There was a single letter and a single meeting, and that was it. There was nothing that could provide a reasoned basis for that change in position. I would also submit... Do you need to have the Park Service disagreeing to have a controversy? You absolutely do not. Have it be highly controversial. Controversy alone is not enough. Yes, thank you, Arlen. That was where I was trying to pivot to, which is we do have many other agencies with expertise here and many non-agencies and entities with expertise such as my client, the National Trust for Historic Preservation. But we do have the Advisory Council on Historic Preservation. We have the Argonne National Laboratories, which houses the nation's leading visual impact experts. None of those are within the Interior Department. Nothing said in Secretary Zinke's letter affects their disputes that are absolutely still alive today. And so we think that this is an extraordinary case where you have many letters from every different expert within and outside the federal government disputing what the court did here. And if this case is not a substantial dispute underneath us, we don't know what facts would ever warrant that determination. And so we would submit this court's test from the town of Cape Creek has to apply here. And unless you have any other questions, I'd like to mention a few words about our Clean Water Act argument. So on the Clean Water Act point, we've made a very what we believe is a straightforward and elementary APA point, which is in applying a standard in determining what is practicable or impracticable under that act, which is what is required. Can I just interrupt you for a second? Yes, Your Honor. If we think, and I'm not saying we do, but if we think the court satisfied its obligations under NEPA, does that resolve the Clean Water Act issue also? Or is it different? It does not. The Clean Water Act imposes a substantive test. In fact, it's a presumption that the government must rebut in order to have their determination be found not arbitrary and capricious. And here we would argue that there is no standard that has been applied as to cost. Nine alternatives were found to be impracticable primarily on cost grounds, and there was never any dividing line that was provided to the public as to how the agency assessed what is too costly and what is not. Stepping back for a moment, this is a project that would always be very costly. It was going to cost millions and millions of dollars for a major energy infrastructure project of this kind. So all we're saying is that under the APA, under basic administrative law principles, there had to be some explication of when this project would become too costly rather than just saying, well, anything more than what the project costs is something Dominion is not willing to do. That is not the test. So we would submit that the court has failed to rebut the presumption they're required to rebut under the Clean Water Act, especially where they, for whatever reason, not explaining the record, aggregated the cost of this project, although the standard industry norm in this particular field is to pass these costs on to ratepayers. And when you look at it from a per ratepayer basis, as we have explained, the differences from the project to the alternatives that were deemed impracticable is minuscule. Do you have an alternative in mind that you think is practicable? We do. So there are several that are very briefly dismissed in the EA of JA206, two underwater alternatives. These are just examples. There are others. One of the problems with the underwater one was it meant reliability for 10 years less and took five years longer to build. Is that right? Well, so those, both the cost and the construction estimates, were disputed by the cores on in-house experts. Was there a dispute about how long it would take to build? Yes, there was, and that is cited in both our opening and our reply briefs. There was a dispute both as to the timing of how long the alternatives would take as well as the cost, but as to those underwater alternatives. What about how long it would last with respect to reliability? These would both be NERC reliable for at least 15 years, if not longer. But that's not as long as the other one. So they would have to do something again for 15 years. Again, there would have to be. Well, and at the same time, Dominion has said it's going to come back every 10 years to revisit whether there are appropriate other means. So we think buying a 15-year window certainly would be practicable. And, again, this gets to that question about all these issues, cost, construction, time, logistics. There is no standard articulated. It's here's Dominion's project and what they desire, but there's never anything explaining how and when these other alternatives become practical. I thought that PJM and the others with respect to the reliability question say they have to get it done within a year or two in order to be reliable. That's not a question where they haven't answered that. Again, we're focusing on alternatives that primarily were being dismissed on cost and construction, time, and grounds. And for those, there is no standard in the record. Regardless of what might exist for other alternatives. The construction timing is a reliability question. Because until it's constructed, there's a reliability problem if they have to close down the projects. Our understanding and reading of the record and the way it's been presented by the other side, both the district court and in this court, is that their construction constraints were informed less by current NERF reliability and informed more by other MAP stuff, which is happening under EPA jurisdiction. I'm just reading from JA214, which is the EIS. Longer construction windows mean contingency risks are borne by the system for a longer period of time, which may increase the potential for load shedding, which means blackouts. So I don't understand why you say the construction timing is only a question of cost. Well, no, the construction timing is not a question of cost. What we're seeing is the practicability takes into account all of these separate factors. And it is indisputable that some of these alternatives were eliminated either entirely or primarily on cost grounds. And so we focused on that. Well, I'm asking you which ones. So you mentioned the underwater one, but that one is eliminated not just for cost, but also the problem of reliability over the five years. So what's another one that you have in mind? Well, again, those construction estimates were called into discussion by the court. Can you tell me where the construction estimates are? Sorry, Your Honor. Yes, so this is a JA540. This is from the Corps' own in-house economist saying that Dominion's cost estimates of alternatives seem bloated and excessive, and I could not justify upwards of 75% of their estimates. On the same page, the same Corps official concluded, quote, the construction duration estimates for various alternatives also seem high, too.  And this is the problem. When you don't have a coherent standard, you're telling the public, this is how we're judging this alternative versus the project, there's a lot of confusion as to how these numbers that Dominion is coming up with and that the Corps has been taking and incorporating into its analysis, we don't have any proper benchmark to determine whether or not that is arbitrary. What do you mean by that? You've said several times that you need a benchmark or standard. I understand your point that the information that the Corps supplies, it has to be accurate. It's cost estimates and time estimates and it all has to be accurate. But say something more about these standards that you say are missing. Well, first of all, what requires them? And secondly, what would they look like? Yes, Your Honor. So the Clean Water Act's regulations very clearly require the Corps and Dominion to rebut a presumption. And what the Tenth Circuit has said in looking at that is that the Corps must, this is a quote, must provide detailed, clear, and convincing information proving impracticability of every single alternative eliminated. Okay, that doesn't say anything about standards. So to do that, the only way you can provide clear, detailed, and convincing information that an alternative is in fact impracticable as required by the Clean Water Act is by making that showing. And the only way that an agency can make that showing is by setting forth something on this side of an appropriate metric within this industry is impracticable and something on this other side could be practicable. Without that, the public and the court is left without any ability. And what's the standard you're talking about there? So the standard is that you have to, for costs, for example, say for a project of this size, of this magnitude, we looked at other comparable projects done by other companies within the industry and we determined what would be a practicable project under these circumstances. Well, did they do that? They absolutely did not. There is not a single other project that they looked to to determine what rate payers would find to be reasonable cost. They did not apply any sort of metric in terms of how this will be shared among 900,000 rate payers. Instead, they aggregated the cost to make more expensive options look less practicable. And we would submit that that is arbitrary and capricious and cannot withstand APA review. Okay, thank you. Good morning and may it please the court. My name is Dustin Magenclar and I represent the United States. With me at council table is Melanie Kastner from the Office of Chief Counsel at the Army Corps of Engineers. The project at issue is essential to stabilizing the electric grid and providing reliable power to hundreds of thousands of people. The court took a hard look at the project's potential impacts, examined nearly 30 proposed alternatives and determined that the selected project would not have a significant impact. What is your test for highly controversial? It's the test set forth in this court's decision in the town of Kidd Creek. All right, so that test is size and effect. And effect is clearly extensively contested in this case. So I get that that's what you look at to evaluate highly controversial, but why wasn't this highly controversial? They were debating for years from a broad variety of perspectives, with an awful lot of information, the effect. Well, I have several responses to that, Your Honor. First, the only element of a highly controversial test that's at issue here is whether there was a substantial dispute at the methodology regarding the effect. We use size, we use- Why methodology? Why is methodology an issue? Well, that's the alleged- that is the substantial dispute that's been alleged by the appellant, is that there was a dispute as to the methodology for assessing the visual impact on historic resources. I think the dispute is just that there's- about what the effect is. Why does it have to be about the methodology? The case law supports that there has to be something more about information. So, for example, this is the Biodiversity Conservation Alliance decision, that there has to be information in the record- What court is that? I'm sorry? What court is that? That's from the Tenth Circuit. Information in the record that casts substantial doubt on the adequacy of the agency's methodology and data. So that's an example. It has to be more than just- Where did they get that idea? And the idea that there has to- Where did that circuit get the idea that it has to be about methodology? That it comes from- that there has to be more than just the existence of opposition to the project. That it can't just be disagreement about what the effect is, because that decision is entrusted to the lead agency's discretion at the end of the day to assess whether the effects of the project are going to be significant. Is there a dispute about that? I don't understand why the fact that it's entrusted with the lead agency makes it not controversial. I don't understand that. Well, Your Honor, I'm simply saying that the core here is the agency entitled to deference and making the judgment about whether the effects of the project are significant. But let me walk through the two reasons why there is, in fact, no dispute here with respect to the effect of the project. So, first, talking about the actual kind of substantive back-and-forth. There's been a lot of what I would say inaccurate representation in the briefing this morning about the history of this project. It is absolutely true, of course, that the Park Service specifically opposed the project and sent several letters to that effect. But it's not as if there was some epic back-and-forth between the agencies here. The core received the comments, they took them seriously, and they moved forward based on them. So, for example, the primary comments that we see from the Park Service throughout the record and including in the final letter in January 2017, criticizes the assessment of visual effects and the cultural resources effects assessment. The core received those comments, it met with the Park Service to discuss the Park Service's guidance for assessing visual impacts, and then it turned to Domain's contractor, TruScape, for the preparation of photo simulations. So, TruScape, which prepared these simulations that show what the project will look like from every relevant vantage point, including on the river, demonstrated that its methodology is consistent with the methodology with the guidance advocated by the Park Service. In fact, TruScape helped develop the guidance that the Park Service asked the core to use. TruScape revised its photo assessments, and it added new simulations, responding to the critiques that had been raised. Now, the core then conducted several field visits, including by boat on the river, and reasonably concluded that TruScape was sufficiently accurate to analyze the effects both to historic properties and the visitor's experience, and that it was not likely that employing further methods of visual impact assessment will result in substantively different views or information. That's the JA 246. The pictures that I saw on the record, lots of them focus on far, far away, and they don't be taking pictures from closest land points at many opportunities. I disagree, Your Honor. The photo simulations were taken from every historic resource in the site that the core found to be adversely affected under the Section 106 process. The appellants do not contend that there are any sites from which a photo simulation was not prepared. In fact, the appellants do not contend the accuracy of the TruScape simulation. The NPS final letter in January 2017... Wait, wait. I mean, Argonne. Argonne. An individual at Argonne, not Argonne National Laboratory itself. Argonne disputed the nature, quantity, and distribution of scenic quality around the project and the types of viewers and the different expected views that people would take. Those comments that were submitted, the Park Service asked an individual at Argonne to provide comments that was attached to the Park Service's final letter in January 2017. Those comments discuss entirely the cultural resources effect assessment. It is absolutely silent as to the methodology used by TruScape. It doesn't dispute that TruScape is accurate. He's just saying you don't have pictures from the right angles and all the comprehensive angles. At least when I look at them, it seems to be far away or a couple in the middle of the river. To the extent that it's a fair reading of the Argonne letter, it's completely belied by the record. There's an extensive, not only the simulations, but actual photography from all of the relevant viewpoints documenting the existing views that were used to- The J.A. 2678 has a picture from Carter's Grove. And the angles, at least the red lines when I'm looking there, are all from the furthest corner away in Carter's Grove. There's none from the closest corner in Carter's Grove. That photo has red arrows on it, you said? Yes. Then that's coming from the cultural resources effect assessment. That's not the photo simulation. Where in the record are the pictures from the closest spot on Carter's Grove? They are all cited in our brief. I can go try to identify those at this time if you would like. But we cited from Carter's Grove, from the historic parkway, from the east end of Jamestown Island. We cited those specifically as to the TruScape photo simulation. We also- another example that I think would be helpful for the court to consider is J.A. 1240. J.A. 1240 is a photo simulation of the completed project with the ghost- Can you tell how much volume that is? We've got so much volume. That is very true. That is in volume four. So, in fact, the entire- one of the complete sets of photo simulations begins at J.A. 1189, which is in volume four, and runs through the end. The ghostly picture that I mentioned, photo simulation, is at J.A. 1240. There is no argument raised by the appellants, by the Park Service, by Argonne, by anybody, that the TruScape methodology as it was updated, as it was clarified, and then the additional work that was done in 2016 is inaccurate, is inconsistent with the Park Service guidance, that there are any historic sites in this area that were going to be adversely affected under the 106 process that did not have photo simulations prepared. Photo simulations were prepared from on the river, such as the one I just mentioned at J.A. 1240, to identify the perspective of the voters. The court field verified the accuracy of the TruScape simulations. Part of that process also involves comparing the simulations to the actual existing transmission line that runs next to the James River Bridge, further downriver, and the court reasonably concluded that the TruScape photo simulations were sufficient to get an accurate understanding of what the project would look like when it was completed. I will note, too, that the preparation of the simulations in the J.A. is not precisely how they're supposed to be viewed. They're supposed to be printed at a certain size and then viewed from about 20 inches, depending on which one you're looking at. But the point is that the court considered the NPS objections. Is your position that only disputes without methodology can meet the highly controversial standard? That is the argument that has been presented here. Is your position, on behalf of the government, that only disputes without methodology? I'm not prepared to draw a bright line test here. What matters is that, in this case, that's the argument that has been presented, that there was a dispute as to the methodology for how to assess the visual effects of this project on historic resources, raised by the Park Service and its commenter from Argonne. That is the- So, do you think the letter from Secretary Zinke plays any role in this at all? Yes. And what is that? So, yes. So first- I mean, is that necessarily to your argument? No. It's not. So a primary argument- In other words, your argument is that the court completely responded to the National Park Service's concerns, right, and made its own judgment. That's correct. And so then what's the role of the Zinke letter? So the Zinke letter is the second reason why there is no dispute remaining as to the effects of the project. So, as was discussed this morning- I mean, first let me say, we categorically reject the idea that Secretary Zinke's letter is subject to APA review or the FOX test for an agency changing its determination. This is simply a comment letter submitted during a NEPA process. The Park Service, Secretary Zinke's comments are not subject to APA review here. So there's no- If Secretary Zinke wants to send a letter one day and send a letter the next day in this context, that takes a different position. There's nothing in this context that prohibits him from doing so. So there is no requirement for what the Secretary would have had to have said in his letter somehow to make a difference here. Well, for it to be useful, for him to have said, okay, I'm satisfied, the court has satisfied me, shouldn't a letter about the National Park Service's concerns, shouldn't it at least have mentioned the National Park Service? I suppose it could have. But it didn't, right? It did not, but as Your Honor observed, the Secretary of the Interior very much oversees the Park Service and it's the ultimate desire at the end of the day. But he doesn't even mention the concerns of the National Park Service. I can understand your point about not mentioning the Park Service, but he doesn't even mention the concerns that it raises. Well, he mentions the concerns that were raised by the previous Secretary in her January 2017 letter, and those were certainly founded on the objection. I don't see, there's nothing in there about, you said, well, this is all about methodology. I don't see anything in there where he even addresses the dispute about methodology. Well, Secretary Zinke's letter was primarily in the context of, well, the letter from Secretary Jewell in 2017 clearly was referring to the objections raised by the Park Service. So Secretary Zinke was following on the correspondence from his office by his predecessor in articulating this view. What he does say is that the Department, on behalf of the Park Service, would sign the Section 106 Memorandum of Agreement under the Preservation Act, which constitutes agreement as to the resolution of adverse effects on the historic resources. So is that the same thing as the NEPA question exactly? No, but it's certainly indicative that he, as the head of the Department, was comfortable with what the Corps had done and that the Corps had resolved the adverse effects on the historic resources. But your first position is you don't even need that, right? That's right. And say why again. Because the Corps responded to the Park Service's comments, it took them seriously, it had additional work prepared to enable it to assess the visual impacts of the project, and it reasonably relied on that other work, such as the photo simulations, such as this in-person field use, to make the judgment that the visual impacts on the historic resources did not reach the level of significance. Clearly, nothing has been ignored here, and that's the primary question that the Corps asks when reviewing an agency's decision not to prepare an EIS. I do want to add one other point on the Secretary Zinke letter that I think Judge Millett referenced this morning, which is that maybe the view in the Park Service letters or the other letters is reasonable, but the Corps also had a reasonable view. So Secretary Zinke's letter, at a minimum, suggests that both views are reasonable and acceptable policy choices for the agency to make. Doesn't that suggest controversy? Highly controversial? No. We have really good arguments on both sides, I guess. I get your points about we're not reviewing the Secretary's decision here at all. I'm just trying to understand why that would remotely eliminate controversy and not confirm. A project can be controversial. The highly controversial factor is not just a pure yes-no test. I get that. It's the degree of controversy. But ultimately, what's even more important is that the objections that remain here at the end of the day, to the extent they weren't withdrawn by Secretary Zinke's letter or from others, is that they go to the Corps' conclusions. They don't go to how the Corps got there. I know that's your methodology point. Great. But under the standard of review, it does not matter whether the Corps thinks that the impacts are significant. It doesn't matter whether the NPS, the Park Service, thinks they're significant. The only thing that matters is whether the record allowed the Corps to reach the conclusion that the impacts were not significant, whether that conclusion was reasonable. I mean, for the purpose of this question, the question is whether the Corps could reasonably conclude that the impacts were not highly controversial. The question of the impacts is not highly controversial. But the highly controversial test is just one of the intensity factors. Again, we can go through the other ones as well that are implicated here. But as to that one, I thought your position was that there was no controversy left at all, let alone something being highly controversial. There was opposition left. There was disputed- So how do we know which opposition counts in a highly controversial analysis? Well, let's take the Park Service's final letter in January 2017 again, which, again, is what the appellants primarily are relying on. What I'm actually trying to do here is understand what your legal rule is for what counts as highly controversial. Everyone says, here's this highly controversial test, and just the fact of disagreement can't be enough. I understand that point. The word highly controversial has to do some work here. But what about, for example, an agency's 180-degree turn after years and years? Maybe perfectly justified. I'm not disputing that. It's sort of the case. But there's sort of acknowledging really good arguments on both sides that do not get rejected by secretaries. Maybe it doesn't throw them away, discard them. You have opposition from a wide variety of entities, in addition to the Park Service, raising a wide variety of different concerns. You have an enormous number of comments. You have a record that's replete with describing this as a controversial project, breaking sort of new ground, part of the fun here in what it's doing, coming across a river that hasn't been crossed anywhere before. There's going to be modern intrusions on this door, landmarks. Why isn't that totality of circumstances, totality of factors approach relevant to highly controversial? Why wouldn't it be enough here? Well, there's obviously a lot there to unpack. I understand. I think part of the challenge, with respect to trying to identify, you know, what is the rule, what is the exact test, I submit that there isn't a right line test that's been established. I think if you look at some of the different cases on this issue, there's, and particularly this is more at the district courts that have kind of grappled with these issues, there's discussion of saying it's not exactly clear what constitutes highly controversial or what is. So that's why I point to that Tenth Circuit decision that says, so there has to be something more than just opposition. We know that. So the question is, what is something more? And I think that is the question that Your Honor, I think, is struggling with. And the Tenth Circuit example is that court saying, well, we think something more, for example, is, quote, information in the record that casts substantial doubt on the adequacy of the agency's methodology and data. So that's the solution that that court came up with for identifying what the something more than just better opposition is. But opposition- But you weren't ready to embrace that rule. Well, I'm not saying that that is- Enormous amounts of heated controversy by a wide spectrum of individuals and a wide spectrum of concerns about, you know. Am I correct in understanding what you said before? My point before was that I'm not prepared to take the position that that test set out in the Tenth Circuit is the only way that someone could ever- that the highly controversial factor could ever indicate significance of the offense. Okay. But I'm saying that is the argument, the primary argument that's presented here. Now, to address some of the other points that you raised, in terms of the variety of objections, I would submit that there's not that much variety. It's essentially that this is going to have impacts on the viewshed and that there's dispute by- That's what this is all about. Correct. That's right. Right. But I'm not- So, I think the other thing- That's what this is all about. I think the other- That's absolutely right. But it's important to keep in mind, I think, as well, that there are a variety of other potential impacts that were considered that were- the court concluded were absolutely minimal at most and didn't come anywhere near rising to the level of significance. So, the only piece of this project that we are talking about from the question of significance is the visual effects. So, the other piece of this that we haven't had a chance to- But that's the major- That's what this is all about. I don't need to repeat myself. Well- It doesn't help me for you to say that's all it's about. Well, no. My point is from evaluating the potential for whether this is a highly controversial project, all the other impacts clearly do not come anywhere close to it. So, the question is the visual effects. Now, if I can, the piece of this we haven't talked to- talked to quite as much is how the court reached its conclusion that the visual effects here did not rise to the level of significance. We've talked about the methodology piece. We've talked about the reliance on the- Can I just adjust your sentence before you go on to prove that point? Because what's of interest to me is how they concluded not only were significant, but that there was not a high level of controversy about visual effects. How did they conclude that? They concluded that because they addressed the Park Service's comments. I mean, and I would point to the- But it's taken into- If what you're saying is they said, I hear you. Boy, there's a lot of people from a lot of different perspectives opposing this. We've heard you. That doesn't tell me there's not a controversy. Well, again, I disagree with the idea that there's a lot of different perspectives that are represented here. Yes, a lot of people sent formed comment letters saying- You've got the state government. Actually, I'm glad you brought up the state government because that's the point I wanted to make. You had it coming from- There's sources that are cited in the brief from state government. You've got the antiquities folks. You've got the National Trust for Historic Preservation. It's not just- And we can put it to the side. It's not just an in-house fight, for example, between- I assume there was no decision by Secretary Zinke. It's not just an in-house fight between- or internal to the government fight between the Park Service and the Corps. You have a lot of outside interest. There are- Enormous amount of public comment. All from the- My point, I don't disagree at all with that. You're absolutely right. My point that I was trying to make was that it's all from the perspective of historic preservation. And so I was saying, in terms of the kind of universe of comments and nature of the comments, they're all coming from the same perspective of, we think this project will have an acceptable impact on historic resources. So I do want to make the point, though, that the State Historic Preservation Office, Virginia, I'm blanking on the actual name, but referred to under the Preservation Act as the SHPO, the State Historic Preservation Office, concurred in the Section 106 Memorandum- Before you lose on the other two points, you might want to respond to their arguments about the CWA and about Section 110.5. Why don't we start with 110.5? Okay. Assume for the purposes of this question that you are wrong and the district court is wrong about the meaning of directly. What happens next? So I will reluctantly- I'm not asking you to concede. I'm just asking you to assume. So our position is, as was discussed this morning, that the court doesn't need to resolve the question because the court did satisfy the requirements of Section 110.5. And how about this? So, first, they informed the Advisory Council and the Park Service that there is a National Historic Landmark that is that it would be adversely effective, as that is understood within the meaning of the Preservation Act, and provided extensive information. So this- Going back. That landmark is Carter's Grove. The question with respect to Section 110.5 solely relates to Carter's Grove. It's only about listed National Historic Landmarks. So the court informed the Advisory Council and the Park Service that Carter's Grove would be adversely effective- That's sort of the 106 question. What about the 110F? That is the 110F question. Well, I'm going to read the statute. Tell me how you satisfied that. Yep. So, part of that is- The responsible federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to the landmark. Right. And I began with the procedural because the next sentence of the statute says that the court has to provide the council an opportunity to comment with regard to it. So, the way that it minimized the harm to Carter's Grove was that it considered the number and distance of towers from the Carter's Grove mansion that would be viewable when it was determining the route that the towers would take across the river. So there are two towers. On the selected route, there are two towers that will be visible from the house. The house- Carter's Grove is listed on the National Register. Isn't the entire thing a landmark, not just the house? Yes, but it's registered on the historic- on the register for its architectural- The entire Carter's Grove, not just the house, protected as a National Historic Landmark? Right. I said yes, it is, Your Honor. Okay. We're back to the problem with the perspectives where you're looking from. Why are we just looking from the house? Well, we're not. So, in the record, there's ample documentation of photography from a variety of points on Carter's Grove, from the shore, from midpoints, from the house itself. Again, the house is designated and registered because of its architecture. That's why the property is on the landmark. So, that is why the focus is on the house, because the house is the center point and it's listed for its architecture. There are only, from a variety of points- If you're standing right at the shore, then yes, there are more towers that are visible. If you're at the house, there's only two that are visible. The closest is 1.76 miles away. And the court considered the number of towers that are visible from the mansion and the distance of those towers when choosing among the four different routes that the towers could take across the river. The court minimized the harm to Carter's Grove by selecting the tower route that would minimize the number of towers visible from the mansion. To the maximum extent possible? Yes. Of the four routes, they chose the route that has the fewest number of towers visible. But does 1.10 require you to maybe rethink even what routes you're considering up front? Because you have to front load the concern with protecting the landmark, not just focus on the purposes of the project. No, I disagree. And this goes back to some of the discussion this morning. First, council was conflating some of the requirements of 1.06 with 1.10f. The guidelines are not binding. The court does not require to follow them, even if Section 1.10f applies. Okay, what are- Did they get me in that one? They went through notice and comments. The guidelines? The guidelines are- They're not binding. They have no regulatory effect. Not binding because among other things, they say they're not binding. They do say they're not binding. And then the Park Service has no authority  to promulgate binding regulations to implement Section 1.10f. I didn't realize that we were going to get any reference at all. Or whether- Are they even challenged? Are those guidelines challenged in this case by the court? Did they say they're wrong? No, they just said they're inapplicable. Exactly. Right. Are you disputing that they're guidelines? Because your position is- My position- What they say is wrong. The guidelines are wrong. We shouldn't look at that. The guidelines are simply not relevant because they're not binding. They have no regulatory effect. The court is not arbitrary and capricious. I look at them as like an expert opinion, at least. Not binding on the way they analyze this. Well, two things, Your Honor. Do you disagree? Do you say their test is wrong? We shouldn't look at it at all? We shouldn't ignore it completely? There's no obligation to do so. So why would the test for whether the court was arbitrary or capricious here rely on non-binding guidelines that have no regulatory effect? But I want to make two other points on this issue as well. First is that we disagree, I think, with the point that you made this morning, which is that even if Section 110F applies, the guidelines are still not binding and still have no regulatory effect. So we don't concede that even if 110F applies, that the guidelines would have any regulatory effect. There'd be no obligation for the court to consider or follow those guidelines. But also, if we do look at the substance of the guidelines, the guidelines say that the obligation is to consider prudent and feasible alternatives. The court considered 28 alternatives as part of its work here and determined that all but one were not practicable. No, but that was all done by an agency that thought 110F wasn't applicable, right? That is correct. That's correct, right? Yes, that's right. Okay, so explain to me... I mean, I can understand your argument that we can look at the record and determine that the agency complied with 110F on our own, but it seems to me it's very different when the agency itself says it doesn't even apply. How can we find that an agency that says it isn't obligated to comply with 110F nonetheless did so? In other words, wouldn't it be possible that if we sent back and the agency knew it had an obligation to comply, its analysis would be different, maybe more rigorous? It's theoretically possible, but I don't see any support or any basis in the opponent's argument for suggesting it would be here. And so even if the agency says we don't have to comply with this... Well, it could say that, right? Right, but that doesn't mean that the agency's actions cannot in fact satisfy the requirements of 110F, which at the bottom is just a heightened procedural standard with respect to national historic landmarks. So your point is that in response to my concern, well, the challengers here haven't pointed to anything in the agency's response that would indicate it didn't otherwise comply. Is that your point? That's right, that's right. And some of the discussion this morning, Council was attempting to rely on the Presidio case from the Ninth Circuit to answer this question of what more should they have done. But again, that's the part where the actions that Council identified at Presidio were part of the 106 process. That was part of the exchange of views in the initial development of the project. The question the Ninth Circuit concluded in those circumstances that they didn't see what more the agency could have done. And again, they haven't shown anything particular here. They considered 28 alternatives. Can you show me in rejecting those alternatives or just point me to where I would find the core to the maximum extent possible in its planning as well as its actions to minimize harm to the landmarks to the maximum extent possible? Many of those alternatives would have avoided any visual effects whatsoever by burying the line underneath the river. Those were all reasonably rejected as impractical. So what more could be done than to consider alternatives? Like the James Bridge. They considered it. I know, but to the maximum, do they do it with the goal of avoiding obstructing the view from this landmark to the maximum extent possible? Is that in the record as opposed to feasibility balancing? Well, you're not going... So the primary... You're not going to find precisely that in the record. And the reason why is because the agency action here is the issuance of a permit under the Clean Water Act. So the primary question for alternatives is whether an alternative is practicable. There's no... I'm just not following up on whether the record here would assure us that 110 was satisfied. So I'm just quoting the statutory language to you because this does seem to put a pretty heavy thumb on the scale at a very early stage in how you even think about designing or planning your options. There is no authority offered for the idea that the Section 110-F procedural standard could trump the applicability test under the Clean Water Act. Why? So there's no authority... I'm sorry, so you mean the statutory language is just redundant of the Clean Water Act? I am saying that... I am saying that where the agency action is the issuance of the permit, the primary question in evaluating alternatives is whether those alternatives are practical. We do not agree... I'm just getting... I'm sorry. Appellants have not offered any authority that shows that you would have to consider an impracticable alternative solely because of 110-F. Well, it all depends on what you mean by impractical. If impractical means cost, as it did to some options. Well, impractical means any of the bases that are identified. And then how do you reconcile that with maximum extent possible? So I think you can reconcile that by saying to the maximum extent possible, meaning if an alternative is not practicable under the Clean Water Act and your action is a Clean Water Act permit, then it is not too possible to further consider an alternative that cannot be considered further... Can anybody talk to that view of 110? I don't think there's... Any court, any agency, anybody? I mean... Any court, anybody? Appellants have offered no authority for this. You just gave me a view on how we should read the statutory language. I'm just asking if there's any authority for it whatsoever. All right. The closest I would point to is the Ninth Circuit's discussion. That is, I think, the most extensive discussion of 110-F that I am aware of. I would note that there is no case law that has ever found that 110-F applies to a federal project where there is no physical impact on a national system. Can we talk about practicability, then? Yes. So... I guess the other side raises a couple of questions. One is... How do we know this is too costly to be practicable? What's the test for that? Second... How much of this is based on reliability with respect to the amount of time that's required of the underwater project? And then third is this reference to the one sentence in an internal document saying I have some doubts about construction time. Could you respond to all three of those? Yes. So I'll make the threshold point that the appellants have not identified a single alternative that was rejected solely on the grounds of cost. So even if there was some merit to their argument, which there is not, then it wouldn't change anything about the Corps' Clean Water Act practicability analysis and the Corps' consideration of the issue we submit can end there. They offer no authority other than pointing to Utahns in the Tenth Circuit to suggest that there has to be an objective benchmark set for determining practicability analysis, and Utahns doesn't actually say that. Utahns makes reference to having to establish impracticability. Here, what we're talking about is... So they point to a specific alternative that would cost $391 million. The selected project would cost $178 million. The Corps looked at that and said that's over $200 million more expensive. That is excessive in terms of cost as compared to where the proposed project is. So that just means... So you transitioned to the word excessive there. This is what is clearly more, clearly a lot more. But balancing all of the interest on the other side, how do we know that's too much more? Well, because we don't balance all of those other interests at the practicability test. Under the Corps' regulations, 40 CFR 230.10A2, we look at cost, logistics, and technology in light of overall project purpose. That's it. So questions about... We might look at that under 110. But we're talking about the Clean Water Act. Under the Corps' regulations, you don't consider visual effects on historic resources. That would come in under the public interest review when you get to that part of the permitting process. At the practicability test, it's just cost, logistics, and technology. This Court has said in Van Antwerp that a reasonable analysis of cost is entitled to deference. I'd also point to the Friends of Santa Clara River decision out of the Ninth Circuit, which says the Corps is not required to use any specific metric for evaluating cost. It just has to be reasonable under the standard arbitrary and capricious review. That's for how much it costs. How about for the... whether it's practicable? Well, I think it's not just how much it costs, but it's also for what metric the Corps uses. Essentially, what is the Corps' approach to assessing cost? That's entitled to deference so long as it is reasonable, and we submit that it was here. The, um... What about reliability? Reliability. So that was... that goes to overall project purpose. One of two components of the overall project purpose are relevant here. One is compliance with respect to the mercury and air toxic standards, and the second is to ensure compliance with the mandatory reliability standards. So the timing specifically... Judge Garland, you referenced various points in the record this morning that I frankly can't add much to that go to exactly why doubling the length of time from the alternative NPCA... so two years for the selected project, five years for that one, that is inconsistent with overall project purposes, which includes compliance with the air toxic standards and compliance with the reliability standards and the fact that the longer delay would lead to a greater risk of blackouts and perpetuating a reliability emergency in the area. Talk about risk. Do you know what that risk is? I'm sorry. Which risk, Your Honor? Of blackouts. Ah. Like how to quantify the... Well, because it's shown out that there's a risk of blackouts. It was also done with the James River option. Mm-hmm. Um, is it... I may defer to counsel for Dominion to try to tackle that one better than I can. I will say that the risk is most acute in the summer and the winter because that's when the demands for heating and cooling are the greatest. Um, the... I will note that Dominion, in its opposition to the motion for injunction-paying appeal, included declarations saying that... so essentially the way this works is if they detect that they're getting within a certain threshold, a computer system takes over that will automatically initiate the blackouts if it kind of... to prevent a fault, and that they did have to arm that system, I believe it was twice earlier this year. In either case, did it actually get activated? That's what the blackouts occurred, but they have had to arm that system. Could you go on? There's one sentence in the... Yes, so the record. Yeah. So counsel is identifying, um, again, taking one part out of one internal reviewer. So the person they're talking about was the sustainability program manager. She was asked to look at a number of the alternatives. She did ask... raise a couple of questions about cost. Other folks from the Corps who reviewed this were their chief electrical engineer, another electrical engineer. Both of them concurred, uh, in the... I mean, that was all fed into the Corps' white paper analysis of alternatives. Do you know what, um, the folks within the Corps that were making their own review, um... What did they... Did the record show what steps they did to make this independent review? Did they just review what Dominion... to look at what Dominion said and see if it made sense? Did they do their own research? They had the information from Dominion. They had the information that was submitted by the appellant. By the appellant's retained consultants. They essentially had available to them all of the relevant information, and then they were able to... they did pose questions to Dominion. You did? Yeah. It was in the record? Yes. Um, and did they rely on the... There's this whole thing about the TAVR folks wanting this information from Dominion, and then... I don't want to go into all that whole history, but did these, uh, engineers inside the Corps rely on that information from Dominion? Well... Because Dominion says it's critical. Well, the... the data that was, um... that they claimed they were denied was... it certainly informed what Dominion had prepared in terms of its discussion of the various alternatives and what the options are. I'm sorry. Did they rely on... did they have... and I'm not saying they were wrong with it, I'm just saying, did they have that information? I don't know if... That was ultimately so they didn't need. I don't know if there's evidence in the record that shows that they had the raw data, but they apparently had all of Dominion's... They had Dominion's analysis. Yes, they had Dominion's analysis, which was based on that data. So, in addition, I would also point out to the fact that the... they also had the review by PJM, the Independent Neutral Third Party, that was asked to opine on certain of the alternatives. And the other point of the record I was pointing to, Judge Garland, with respect to the costs, is the, uh... the evaluation of costs that was performed by the State Corporation Commission, which the Corps specifically referred to the fact that the costs had been reviewed as part of and evaluated as part of the State Corporation Commission's process and that, specifically, the Commission had decided that the realities of underground alternatives were inconsistent with the needs of the project with respect to complying with MAS and to ensuring sufficient reliability. My last point, I would say, is that under the credibility accounting of handovers from the Fourth Circuit and Nuclear Info and Resource Services in this circuit, it was established precedent that it was reasonable for the Corps to rely on the data that was submitted by... All right, we're about 30 minutes over. Does anybody else have a question? I'm going to hold you to your six minutes, sorry. It is perfectly fair, Your Honor. Good morning and may it please the Court. My name is Albert Lin and I represent Dominion Energy. If I may, I'll start with the NEPA question that the Government Counsel addressed. I'd like to try to answer the question about what exactly there can be a controversy over, whether it's methodology or the ultimate conclusions. I think the first place to start, Your Honor, is what is the alleged controversy here? And I think if you look at the briefs and the letters, you will see that there's essentially two things over which there's alleged controversy, methodology and scope of review, and I think the second is, as has been discussed today, this idea of what was the ultimate conclusion on significance. I think the reason why you can't consider... There's two reasons why just a dispute over the ultimate conclusion on significance can arise to a controversy. One is there's some circularity there because the existence of a controversy under the regulations is what informs whether there is a significant effect. And so the fact that there are just disputes over whether or not there is a significant effect can't feed back into creating a controversy that is enough for there to be a significant effect. And I think that... That doesn't make sense to me. If you had a case where there was vehement, lengthy, extensive disputes about the view and the agency was of the opinion that this is a really close call on significance and there are really valid, seriously held views about what the impact of this is on the view, how bad this is, how it's going to affect people. Experts saying different things. Why wouldn't that be exactly what would be... One of the things that would be factored into it is something highly controversial for purposes of significance. Again, I think... I'll try to come at it again from a different angle. I mean, I think the other answer to that is that significance, as this Court has said, said in the public citizen case, that ultimate conclusion is left to the judgment of the action agency. And so the idea that simply because... Well, not the end review judgment. Well, it has to be rational, right? It's just the review. And part of the way we review is we look at these factors that they've identified and we say is their decision consistent with what they've said would trigger environmental impact statements. Which is why, Your Honor, I think there's a circularity to that because if the existence of controversy informs whether or not there's a significant impact, the fact that there is dispute over whether there's a significant impact doesn't seem to be able to circle back around and create a controversy that is sufficient for significance. And I do think it undermines the case law that says that the ultimate determination is left to. And I understand the deference there is, of course, to judicial review as to rationality of that. But the determination of significance is left to the agency. Do you want to say something about what your other counsel left for you to say something about, namely? The reliability, yes, yes. The first place I would point to, Your Honor, is a lot of this was addressed in the briefing on the stay request. And there are... I'll refresh our recollection. Of course, but there are a lot of declarations in there that I would urge this Court just to take a look at. I think the simplest answer to this is the Secretary of Energy has ordered, has determined that there is an ongoing electrical emergency under his authority. And under that authority, he has ordered that the two plants that were shuttered that have led to the reliability problem here must be available to be re-fired up and to run in order to meet the electrical demand in the peak times. And those two plants have been fired up over the past few years. Again, those declarations, they describe that part of the reason those were shut down in compliance with the MAPS EPA order. But there's also reliability concerns with those two plants, the Yorktown I and Yorktown II plants. Again, those are discussed in those declarations as to why there is such an urgent need for some kind of a project. And as PJM has concluded, this is the only project that will meet that. What about the cost problem? Under the Clean Water Act issue? Yes. I think the issue there, Your Honor, is you get to start from the fact that none of the alternatives here were rejected purely on the basis of cost alone. I think if you were looking at something that was rejected purely on the basis of cost alone, they might have a point, right? You had something that cost $250 million, something that cost $260 million. That was the only reason and the only thing the agency looked at. And it said the $260 million one is not practicable. They may have a point that you need to articulate some kind of a more objective standard for why that $10 million difference makes, you know, is this positive. But here, all of the alternatives that they're talking about were rejected for not just cost, which, Judge Millett, as you noted, it is a significant difference. I mean, it's half again as much. It's $260 million versus $391 million. And that's assuming an apples-to-apples comparison, which it isn't, as the government explains. They included mitigation costs into the $260 million for the SCIS project, but not into what for the $390 million because that was never assessed. But in addition, they took into account the logistical concerns, the reliability concerns, and really this is just the review is for the, you know, the classic rational review for a cost-benefit analysis. When you've got costs on one side and the question of reliability, you know, what is the benefit of the particular project, and you weigh them, and that's not something that requires, you know, a particular cutoff, like some number that they identify over which the project would be too costly to be practicable. Can I just take you back to this controversy question? Yes, Your Honor. I'm struggling, I think, as Judge Millett is, with your effort to distinguish a methodology from the ultimate decision. Suppose you have a case where by the time you get to the final decision, there's no dispute at all about the methodology. In other words, both sides agree, say in this case that the simulations are accurate. And suppose those simulations show like total blockage of the view, and the agency nonetheless says, well, we have the ultimate decision, we conclude no significant impact. Are you saying that other agencies disagreeing about how to interpret those does not create a substantial controversy? Yes, Your Honor. I am saying that that does not create a controversy, but that doesn't mean, as Judge Millett pointed out, that the significance determination by the agency is not reviewable. I think there's, and I appreciate your question, because I think it gets to the rub of the distinction here. It's one thing to say, as we do, that the judgment of significance is left to the agency, and that judgment, whether they were right or wrong, whether it was rational or not, and therefore rational in concluding that an EIS was not necessary, is subject to this Court's review. And you can look at that, and you can look at all of the other objective factors that the other side has put in and pointed to, and determine whether there's a rational connection between those objective factors and here, this objective conclusion about the aesthetic impact that the Court drew on significance. But that doesn't mean that it creates a controversy. Controversy, as these other courts have said, and as this Court has said in Cape Creek, I think, is things that sort of go into determining the objective factors for drawing the ultimate conclusion. And so their disputes here about methodology, if they had continued to exist, would clearly create a controversy. I think our position here, and the Court's position is, if you look, if you really go through, and I think this is what Judge Lambert did, if you really go through their letters and determine what were their complaints about methodology, that the Court didn't look at visitorship impacts, that they didn't follow the Park Service guidance for assessing visual impacts, and that there weren't considerations of views from on the river itself. And then you look at what the Court did in response in 2016, and the questions that they asked of Dominion, and the responses that were given, and the additional simulations. And then you look at what they relied on in their reply brief, which is all of their letters from 2017. And I think if you lay those letters from 2017 next to the additional analysis that was done in 2016, you will not find anything in those letters that addresses the additional analysis that was done in 2016. I think that's the government's point, which is the methodological dispute, the disputes about the factors that lead into the ultimate judgment on the conclusion of significance, that was resolved. They may not have withdrawn their objections, but I don't think as a matter of law that's required. Because you can't have a situation where, if they simply adhere to objections that have been addressed, but offer no reasons as to why the additional analysis is faulty, that that would simply create controversy. So all that's left then, if the methodological concerns are addressed, is the question of the ultimate conclusion on significance. And again, that is reviewable by this court. Right. I think we're out of time.  Okay. Thank you, Your Honor. You're welcome. You're out of time, there's no doubt about that. On the other hand, since we went so far over, are you both speaking? You both are speaking. All right, two minutes for each of you. Thank you. Thank you, Your Honor. Four very quick points focusing on Section 110-F in two minutes. To say the guidelines are not binding is not the same thing as saying that they can just be ignored, which apparently is what happens here. That's not reasonable decision-making. I don't understand that point. I don't want to take it. I don't get that. Go ahead. It doesn't make sense to me. It's not just that they're not binding. It says the guidelines have no regulatory effect. That's correct. Yeah, so I think it's perfectly fine to totally ignore them if you're the agency when they say that. I guess our position is it would be one thing if the court had said, we see these guidelines, we don't think they apply here for the following reasons. That would be one thing. But they say they're not binding. Why do they have to repeat that? Well, I think they are, these guidelines are the thing that was promulgated at the direction of Congress to help the licensees comply. Why don't you go on to your second, third, and fourth? Don't waste all your time on this one. Second, just correcting the record, the Presidio case is a Section 110-F case. The three things that were mentioned, changing the project dramatically, adding three alternatives, incorporating the majority of the recommendations of the Park Service, that was all done as Section 110-F compliance, 811 F-3rd at 1170-72. Thank you. Following up on your Honor's point about Carter Strove and the absence of photographs, there is, however, the following from the Cultural Resources Report at JA 2023 and 2024. Quote, nearly all the structures located in the river crossing would be visible from the shore. And, quote, the close proximity to the resource and views to the proposed river crossing in particular would detract from the resource's qualifications for listing in the National Register and as a National Historic Landmark. And finally, JA 1484, this is a letter from the Advisory Council on Historic Preservation, not from the Trust or any other party here, making it clear that part of the significance of the Carter Strove landmark is its relationship to the river. Quote, originally designed in landscape to achieve a calculated view across its holdings to the river and present an intentional appearance to the river. Thank you, Your Honor. Thank you. Thank you. I'd like to make three brief points. First, the government and Dominion are attempting to rewrite this court's test from the town of Cape Creek. It says nothing about methodology. It says a dispute as to the size, nature, or effect, which is exactly what we have here. I took their argument to be that the arguments you made were about methodology. That is absolutely not our position, and our briefs reflect that very extensively. Here, the Park Service, Argonne National Laboratory, and every other entity with subject matter expertise challenge both the ultimate impact conclusions as significant and also challenge the methodologies that led to them. We don't think the court needs to reach methodologies, but if the court wants to, JA 886 through 94, JA 475 through 88, JA 411 through 19, and JA 534 through 37 are all very detailed methodological disputes with what the court did here. Again, we don't think the court needs to reach that. That's not this court's test, but nevertheless, the Park Service, Argonne National Laboratory, and everyone else disputed both of those prongs. Second of all, it is not correct, as the government stated, that no one disputes the August 2016 photo simulations as accurate. That is entirely belied by everything the Park Service and other agencies said after that date. I would again point the court to the agency's final letter, which was in January 2017, that's at JA 475 to 88, and in particular, I would point the court to JA 1237, which shows Dominion's own photo simulation from in the river, more than a half mile from these towers, and you can see how it looms over anything else in the landscape. This is not at all comparable to anything which is out there, which is why the Park Service repeatedly said this is a significant impact as far as visitor impacts, visual impacts, historic impacts, and every other type of resource in this unique area. Finally, on the reliability issue under the Clean Water Act, Dominion pointed the court to its declarations. We would submit that we also filed declarations with the court at this emergency injunction stage from former NERC officials saying that this reliability concern is overblown, that it has been presented in a way that is not entirely accurate, and that this risk of rolling blackouts is not nearly as serious as has been presented to this court. So we think that is relevant to the Clean Water Act. I have a question, and maybe your partner on this knows the answer. This sustainable program manager statement about construction costs, what is the expertise of the sustainable program manager? Do either of you know? Your Honor, we don't see that in the record, but presumably this was... Well, do we have any reason to think that this is a construction expert? That's my question. I don't. This was, however, the expert to which the court kicked this matter. In other words, this person was selected by the court to review... I know. Maybe it may appear to have asked a number of people to comment. I just wonder, is this person somebody with expertise in construction costs? That's all I know. Your Honor, I don't see that in the record. Thank you. Thank you. I'll be honest. I found that argument quite circular, Your Honor. I didn't understand it. The fact is, if an impact is significant, there's every single agency here with expertise, which the court does not have in terms of historic resources. Every single agency with expertise said the impacts would be significant. The Park Service found this is highly controversial under these regulations. That's JA-478. And everything we know about both methodologies and impacts here shows a highly controversial action, including Secretary Lincoln's letter itself. So we don't understand that argument. We don't think it's consistent with this court's precedents, and it's certainly not consistent with these benefits regulations. Thank you. We'll take the matter under submission. We'll take a brief break while everybody changes their chairs.
judges: Garland, Tatel, Millett